Next matter, No. 161976, In Re. Biogen Inc. Sec. Litig. Mr. Canty, you may proceed. Good morning, Your Honors, and may it please the Court. May I reserve three minutes for rebuttal? Yes, you may. Thank you. My name is Michael Canty, and I represent the Plaintiffs in this matter against the defendant Biogen. The defendant made false and misleading statements of present fact regarding their blockbuster drug, Tecfidera, and the true effect that the October 2014 PML theft had on its sales. Despite their claims to the contrary, the defendants downplayed the devastating effect that the theft had on those sales. Consequently, investors were misled and were significantly damaged. The plaintiffs provided extensive evidence of the defendants knowing fraudulent conduct, both in the first substantive complaint and, after new evidence was discovered, in a proposed amended complaint. Despite all of this evidence being discovered within seven months of being appointed, I thought the way it worked is before you file a complaint you have to have enough evidence or enough basis under Rule 11 for stating the cause of action. You do your complaint sufficiency work before you file, not after you file. That's correct, Your Honor. I think that's an important point when we look at the timeline. Lee Plaintiff, in this case, did not file the first complaint. There was a bare-bones complaint filed in 2014. What do you mean a bare-bones complaint? Do you mean one that violates Rule 11? Certainly I don't want to pass judgment on that complaint. It certainly was not a substantive complaint like the one that was filed by Lee Plaintiff in January of 2015. When Lee Plaintiff was appointed by the court, we were granted 60 days to file that complaint. Now, an investigation was being conducted, interviews were being done, and that first complaint that was filed, that substantive complaint by Lee Plaintiff, we submit had enough information to get past the motion to dismiss. Equally troubling, the district court subsequently denied the Plaintiff's request to vacate the judgment after it dismissed the first substantive complaint when they requested permission to file an amended complaint after discovering the new compelling evidence of SIENTA. Counsel, just talk about the first complaint, the amended complaint that you were responsible for. The district court comments critically on the repeated use of adjectives that provide no quantification, steep decline, sharp decline. These are the kind of statements that various sales managers provided. Isn't the district court correct that given the rigorous pleading standard that applies here, that those kind of characterizations just don't cut it? I believe the district court is incorrect, and I say that for a number of reasons. One, I think the district court did not consider the evidence in full. For example, it wasn't simply just these adjectives and adverbs as described by both the district court and the defendant here. We had individuals that attended sales meetings where leadership from Biogen was saying that the PML death was going to have a substantial effect and was impacting sales. We have one specific... But there you're still specific because they admitted that they were impacting sales. So without some type of quantification or generalization, let me take the discontinuation rates because that seems to be a big part of the claim. As I understand it, in December the CFO said discontinuation rates were tracking in the teens and higher than the company would have hoped for. And then in January they said what you cite as one of the misleading statements was when they said, importantly, we have not noticed a meaningful change in discontinuation rates. So when you said this was false, I expected to then see the next paragraph saying, in fact, discontinuation rates had gone up, you know, well into the 20s. There's nothing there. You don't understand that. And I think that that was... What is there in this record that tells me that the statement made in January that you focus on, that we have not noticed a meaningful change in discontinuation rates as compared to the teens rates that were running higher than the company would have hoped for in December, what is there, what allegation should I go look to to see that that latter statement, the one made in January, is false? Well, certainly we now know what the evidence was. And what was the discontinuation rate in January? With respect to the first complaint, the new evidence that was uncovered, we had evidence from two additional CWs and... My question is, what was the discontinuation rate, in fact, in January? The specific discontinuation was not planned. Okay, then how could you possibly say that the statement made in January that we've not noticed a meaningful change in discontinuation rates, how could that be false? Because we had, we had, we had, the individuals that are on the ground, the salespeople that are out there selling this product, that are saying, we are not hitting, we are not having these sales. The doctors are taking their patients off these trucks. But the company has already said that the discontinuation rates were running higher than the company hoped for. They're in the teens. You want us to then find a month later statement that they've not noticed any meaningful change in the rates, that to me says they're still around 14, we don't like it, but they're still around in the teens or something. And we've got nothing in this complaint at all that in any way even indirectly tries to quantify that. Your Honor, respectfully, the district court did find that statement in February of 2015 where they said... This is de novo review, and I'm asking the drafter of the complaint that's before us where I look in the complaint to find that the statement that there was no meaningful change in discontinuation rates as of January is false at all, or even wrong. Well, I think if you turn to CW11, who was an executive assistant, who, who worked directly with the leadership team for Tecmadera... Which paragraph of the complaint do you refer to? Your Honor, I can get you the specific paragraph, but it's the one that references CW10 where that CW said that the director of the Tecmadera program met directly with the CEO on a weekly basis and talked about sales, and when we talk about sales, we're talking about... Is there anything that you're referring to me that says anything about discontinuation rates? I think discontinuation rates is encompassed in the term sales. When we have sales... Is there anything that says that the discontinuation rates were not running in the teens in January? No, no, and I think to require that level of information essentially requires the plaintiffs here to plead evidence. But that's not level when you're saying something. If I say I've got $10 in this jar here, and you want to allege that that's a falsehood, I do think you need to come in and say that there isn't $10 in the jar. It's not a level, it's the particularity requirement, and that's where I find this saying here. I understand the court's position, but I think if you look at what encompassed sales, that's discontinuation rates, that's switch rates, and that's market growth. Counsel, in terms of describing the specifics that you were able to get and are, you would say, reflected in the amended complaint that you wanted to file, you talk about, I think there were two major medical centers that were using the drug ad issue routinely to treat MS patients, and they, I believe the declarations indicate, they, in the wake of this death, they stopped using the drug entirely. Is that correct? That is correct. So how does that, from your perspective, sort of play into the argument that that kind of specific that you would like to add to your complaint would indicate that a statement of Mr. Kingley's, that we have not noted a meaningful change in discontinuation rates. How would that specific information now shed a new light on that statement, that is, would make it sort of recklessly misleading or even fraudulently misleading? Well, I certainly think when two of the largest MS centers in the United States, and let's talk specifically about Atlanta, when Dr. Thrower goes to Biogen in the summer of 2014 and says, you have a safety issue, and then we have the death, the PML death, and he said, I am not starting any more patients on this drug. I am not going to start, and I'm going to discontinue half of the patients that I already have on it because of the safety profile. But isn't the problem here chronology? Because that happened, both of those events, as I understand it, happened in prior to December of 2014. The decision by Dr. Thrower was after the PML death, which was in November of 2014. Right. Yes. So by December, not surprisingly, the company says we've got higher discontinuation rates than we'd like to have. Well, I think that they said, we have not seen... You need to show that there's a change between December and January. What points to that? Well, it's what they're telling the market, and they're saying their discontinuation rates are what we traditionally see. The reality was that this was a huge problem. Discontinuation rates, sales were plummeting because of the PML death. The statement, the defendants don't get to engage in these bland statements of, well, we're seeing discontinuations, things are moderating, which we would expect, when they have two centers that are essentially telling them, there's a major problem with your drug and we're not going to put our patients off. Counsel, I have a different question about that. Yes, there were two major centers dealing with MS. You must have known that. It's public information that these are major MS centers, and yet nothing of this sort turned up in your amended complaint. It's added on afterwards, and the district court says, too little, too late. Why was the district court wrong? I think the district court was... It's a sort of obvious place for you to go looking for the evidence you wanted. I certainly think the district court was wrong because there's no indication that there wasn't a sufficient investigation being conducted. The district court said, well, when an individual doesn't want to speak to you, if you had just asked a few follow-up questions, you would have been able to find this information. That's certainly no way to run an investigation. Certainly we don't have subpoena power. We don't have the ability to drag somebody in and have them speak to us. This is done through the willingness of individuals that were former employees at the company. That's where you start. When an individual was unwilling to speak in the first instance, and then was willing to speak in the second instance, I certainly think that that would only have occurred because of the willingness of the plaintiffs here to say, okay, we understand you don't want to speak to us. We will respect your wishes. Another important factor is the fact that this investigation was continuing. This investigation was continuing where individuals were being interviewed, and they were providing evidence. They were providing internal biogen documents, and the question becomes, why wasn't that presented immediately upon finding? There needed to be a privilege review. There needed to be an ethics review, and I certainly don't... The way the case stands now, it's going to force plaintiffs to just basically take information that they don't have time to properly vet or review, and just submit it to the court, and that's inconsistent with Rule 11, and this court has said that. The district court did not really address your Rule 11 arguments, but the district court did indicate that when you became aware of this potentially helpful information, that you should have properly advised the court that you were pursuing investigations which might enable you to file an amended complaint, which could address whatever deficiencies the court perceives in your complaint, and you should have done that, and you should have asked for time to do that, or time to file an amended complaint. What's... Is there anything wrong with that? It seemed like a sensible suggestion. Anything wrong? Well, I certainly think you need to know what information you're dealing with, and the information that we had, certainly none of it was available before the argument on the motion to dismiss, and the significant information all was developed and reviewed after the court entered its judgment, because it didn't substantively get to those individuals that were working the case until after that privileged review, and I think it's important to understand that this is not a situation where plaintiffs lost, and they said we need to find new information. This information was filed with the Rule 59 and Rule 60 motion within 20 days of the court's judgment. I see that my time has... You've reserved your time. Thank you, Your Honor. Thank you. Mr. Carroll. Thank you, and may it please the Court, James Carroll for the appellees. The circumstances here warrant a close look at the chronology. When the plaintiffs sought to step in to the initially filed complaint, and said essentially pick us as lead plaintiff, pick us as lead counsel to take this case forward, and were successful in that regard, we had a hearing before the district court judge, and the district court judge asked the plaintiffs, how much time do you want for your amended complaint? He gave them exactly what they asked for, and in so doing, and this is at that November hearing, the district court did entirely consistent with what this court has suggested was an appropriate practice, reminded counsel, if you have facts, put them into the complaint. He said, and this is a quote, don't hold something back, wait and see if I grant the motion to dismiss, and then try and come forward with another complaint. The plaintiffs made the choice to proceed as they did, went forward and had an oral argument in April, did not move to amend at that time, or at any point thereafter, and did precisely what the district court judge, and what this court has cautioned against in AVIO met, waited until a judgment entered, whatever strategic purpose they must have assumed that served, and then tried to come forward with a new complaint. At bottom here, that cannot be an abuse of discretion, to not allow that kind of behavior, particularly counseled against, months in advance. That's the argument with respect to the motion to vacate, particularly, but at bottom here, the plaintiffs don't have a case where they say they've just run out of time. The problem isn't a lack of time, it's an absence of fact, and that's made plain by the allegations of the sales people, who say, well, my sales dropped dramatically, with no context. If Confidential Witness 5 selling in North Carolina made two sales last year, and one sale this year, sure, those sales have dropped dramatically, but they're not going to be a drop in the bucket. At the beginning of this class period, there's over 135,000 patients on the drug. That's publicly disclosed at the beginning of the class period, and it continued to grow. The allegations about dramatically reduced sales, as vague as they are, albeit colorfully vague, with plenty of adjectives and adverbs, don't hold any water in the case where the reported revenue and sales numbers are anything but 100% accurate. At every quarter, over quarter, over quarter, applicable in this case, but one, the sales and the revenues increased. In the one quarter, where they declined, the company's overall revenues went down by 3.2%, and the Tecfidera sales went down by less than 10%. That was one quarter, and the company disclosed, not challenged, that that was a quarter, the way the calendar broke, that there was a week less of shipping days, and that there were foreign exchange headwinds, more particularly felt in that quarter than others. The whole notion from the confidential witnesses that the sales fell off the table is belied by the admittedly correct actual sales numbers publicly reported. Further, with respect to the allegations in the amended complaint, which the district court in his decision notes that he considered, I want to clear up what may have been a little confusion of a moment ago. Dr. Thrower, from the Atlanta Center, in his declaration, he testifies that he did his work in the spring of 2014, and he came to the conclusion by August of 2014 that he had sufficient concerns about safety issues. He wasn't going to pull all of his patients off. He had 400 or so. He was going to take half of them off, the other 200 remaining on, and he wasn't going to do new prescriptions at that time. He didn't report that to any, there's no allegation that he reported that to any senior executive advisor. Are you saying this was independent of the death? It had to be independent of the death because it came months prior to the public reporting of the death. It's entirely disconnected from the plaintiff's theory of the case, and it's entirely consistent, not inconsistent, with what Biogen had been reporting to the investing public. Concerns about the discontinuation rates and a moderation of sales growth. Both of those things are entirely consistent with the experience of Dr. Thrower in Atlanta, and Dr. Thrower's declaration is inconsistent with the plaintiff's theory of the case. What he did was independent and prior to this announcement in October of 2014 of a patient who tragically died of PML. Counsel, the district court, and it's a very careful analysis, did seem to focus on some statements of Dr. Kingsley. I refer to the January 29, 2015 earliness call. He cites some statements from that, and then there's a February 25, 2015 healthcare conference where he says, this is in January, no meaningful change in discontinuation rates. February, haven't seen any change in discontinuation rates. And he characterizes those, I believe, as plausibly misleading. I doubt that you would not agree with that characterization. Well, certainly not, and here's why. And indeed, the district court, in coming to that conclusion, then follows on to say why another inference makes a lot more sense to him. So those are statements made, even before the class period, as Judge Gatta noted, the company's saying, be mindful of the discontinuation rates. They're higher than we'd like for oral medication. The statements are made, as you say, in the beginning of January, so the class period's just starting. And then later in time, back in July, so some seven months later, another Biogen executive speaks to that issue and says this. Certainly, one of the dynamics that we've seen, that we didn't expect, was a modest, but not trivial, increase in discontinuations of Tecfidera. That's seven months later. It makes sense, from a common sense point of view, that data about discontinuations, which is only even then talked about as modest, but not trivial, takes a while to filter up. If you're on a prescription drug, and you decide not to take it anymore, your doctor tells you to put it aside, you just don't go refill it. You don't call up Biogen. I just want to be clear. The district court goes on and finds that the requirements of CYANDER are not met, even if these statements are plausibly misleading. Is Biogen actually asking us to reverse the district court on the question of the plausibility of these statements being misleading? I am not. I wouldn't ask you to do something that wasn't essential to the decision. I don't think that's at all necessary. I am trying to put in context these allegations with respect to discontinuation. I would submit that the allegations with respect to discontinuation, taken in context, I respectfully submit don't rise to that level, but there's certainly nothing that would suggest any specific facts in the amended complaint or anywhere else that would have suggested that the statements pointed out were false at the time they were made, or were made with recklessness sufficient to support a claim. You pointed out why there's a serious timing problem with the discontinuation rates at these two medical centers. Does that also apply to the information that confidential witnesses 11 and 12 were prepared to provide? Principally, yes, but additionally, with respect to 11 and 12, it's very nonspecific information that they offer. I thought they had internal documents which had the specificity that was lacking when this first amended complaint was prepared. So an example would be they've included within the record what looks to be a salesperson's performance review document, and re-evaluating the salesperson's performance, they're talking about events with respect to Tecfidera and the PML issue, and that having an effect consistent with what the company said. But it's not specific enough to give you any sense of magnitude or timing. It's similar, very similar in nature to the allegations where one of the confidential witnesses says, well, the sales took a hit, or another one says, well, they dropped precipitously. Well, from what, to what, when, and in what sort of magnitude on a comprehensive basis? If you contrast the allegations here with something like this court's decision in CableTron, where you've got comprehensive company-wide allegations of reports showing massive inventories and massive accounts receivable being built up, reviewed by senior management, they couldn't be further apart from one another. The plaintiffs say in their papers, it's hard to imagine. If this isn't good enough, what could be? And it doesn't take any imagination at all. Do we really need to get into the issue which has divided the district courts, at least in Massachusetts, about whether there has to be a plus factor if a core function allegation is made? I don't think it should be essential to an affirmance here, Your Honor, unless you were persuaded somehow that those allegations in and of themselves are enough. I don't think that they are for the same reasons that the district court didn't. And if you pause to consider the notion of a plus factor, what's uncontested here are the opposite of the plus factors. For one example, unlike many cases where you see remarkably well-timed trading by senior executives, here, the very people being accused of securities fraud, it's undisputed, become greater. They hold the security in greater amounts during the class period. It's counterintuitive. I don't respectfully think the court need go there. If you chose to, the allegations, I suspect, will be found deficient for very much the same reasons as the district court painstakingly went through them and so found. Thank you very much. Thank you. Your Honor, just to answer your question from before, CW10's allegations can be found in paragraphs 68 through 70. And there are specific numbers with respect to sales. And this is what the district court ignored. For example, CW5 talked about how the sales of Tecfidera, you start from 10 to 14 a week down to three. That's specific numbers. When we talked about the numbers from CW11 in the internal review, his quarter 4 percentage, 78% of his sales. Quarter 1 in 2015, 37%. Quarter 2, 35%. Down from in quarter 1 and quarter 2 of 2014 of over 100%. He was far exceeding sales projections they were setting for him. Why is that important? Because this was a huge loss. Quarter 1 lost $91 million shortfall. This while executives are saying, well, we're having moderation. We're not seeing, for example, when we look at relative growth of the product, there's nothing that's a signal that says it's not consistent with historical averages. That was not what was happening and that's not what they knew. And what we do know is CW10 was talking about meetings between the head of the Tecfidera program and the CEO doing, as they describe them, deep drill downs. Their words, sales were plummeting. Those are the words that they were using in these documents that we were provided. And the sad fact is the plaintiffs here don't get the opportunity to present this evidence to the district court for review. We understand the district court's interest in expeditious resolution of these cases and the heightened pleading standards for securities fraud. But this case went too far. And I do want to correct one issue. Yes, it is correct that Dr. Thrower talked about that information in the summer of 2014, but a careful reading of his affidavit states, upon determining in approximately 2014 that the Tecfidera compromised patients' immune systems and, as was reinforced by the PML death in October of 2014, the Shepherd Center completely stopped prescribing Tecfidera for MS patients. Furthermore, the Shepherd Center discontinued at least half of its 400 patients, 200 patients from taking the drug. Does he say when they took those two decisions? It says it was reinforced by the PML death. Judge, I certainly don't want to surmise. I understand the court's position. I don't want to overstate the point. I understand that. But I think when we look at that, that's evidence. That's trial-level evidence, which is not required. And this court, in Borat and Treveria, said that when this evidence is being discovered, it needs to be vetted. And that's what we did here. When were the first quarter results announced? At the end of the first quarter. Right. And were those accurate? Yes, they were. And did the stock move at that time? With respect to the $91 million loss? Yes. I see my time. My time is up. You don't get to say that. I understand that. Respectfully, what we do know is when they finally admitted it, I don't want to speak definitively to that because I don't have it in front of me, what the drop in the stock price was. I think it was the middle of the class period, wasn't it, when the first quarter results were announced? And I think there's no allegation the first quarter results were, even to the penny, inaccurate. I can't dispute that statement. Okay. I think what's important to know, we understand that the pleading standards are strict, but they shouldn't be impossible. And that's what we have here. We have an investigation that was continuously being conducted and that has merit. And the PSLRA certainly was established to stop frivolous litigation and to provide for meritorious cases to go forward. And this decision doesn't either. And we ask that the district court decisions be reversed. Thank you. Thank you. Thank you for listening. This was well argued.